IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| K. ANN GRAY-PRUITT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 04-04289-CV-C-NKL |
| ) | |
| CENTRAL MISSOURI COUNTIES' ) | |
| HUMAN DEVELOPMENT CORP., ) | |
| ) | |
| Defendant. ) | |
| ) | |

ORDER

Pending before the Court is Defendant Central Missouri Counties' Human Development Corporation's ("HDC") Motion for Summary Judgment [Doc. # 29]. For the reasons set forth below, the Motion will be granted.

I.  **Background**

In its Suggestions in Support of Summary Judgment, HDC proffers sixty-seven "undisputed" facts. In her Suggestions in Opposition, Gray-Pruitt denies only ten of them, and only attempts to contradict six with citations to the record. Where the citations even arguably support Gray-Pruitt's contention, the Court assumes her version of those facts to be true for the purposes of HDC's Motion for Summary Judgment. Where Gray-Pruitt has merely denied an assertion of undisputed fact for which HDC has cited evidence in the record, the Court will accept HDC's proffered fact as undisputed. *See*

1

Fed. R. Civ. P. 56(e).[1] The following facts are undisputed for the purposes of summary judgment.

HDC is a non-profit organization that receives government funds and provides services to individuals in the community, including low-income families. One of these services is a Heart Start Program, which is frequently reviewed by the federal government to ensure that it complies with government performance standards.

From February 1999 to June 2004, Plaintiff K. Ann Gray-Pruitt ("Gray-Pruitt") was employed by HDC as Family Partnership and Literacy Coordinator. Her job duties included monitoring and training family service advocates; Head Start recruitment, selection, and enrollment; parent involvement and training; evaluating parents' strengths and needs, and training the Area Policy Council. HDC's Head Start Program is periodically reviewed by the federal government to ensure compliance with its performance standards. During a review conducted in June 2003, HDC's Early Head Start Program[2] was noncompliant in eleven areas. If the program did not improve these areas by its next review in April 2004, especially in the areas of enrollment in Early Head Start, it could lose its federal funding.

---

[1] "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e).

[2] The parties seem to be in disagreement whether the program in noncompliance was the Head Start Program or the Early Head Start Program. The record is ambiguous so the Court will assume Gray-Pruitt's version of the facts for the purposes of summary judgment.

Following the 2003 review, Head Start Program Director Gloria Farnum resigned. In January 2004, HDC retained Beth Ann Smith ("Smith"), a consultant with Mid-Iowa Community Action, to serve as Interim Head Start Director. She was charged with improving the areas of noncompliance before the 2004 review and correcting any other problems she identified in the program. One of the first changes implemented by Smith was to change and clarify job descriptions. Members of the leadership team each signed an acknowledgment of their new duties in an effort to achieve compliance before the next review. The team also put together a work plan and met weekly to discuss strategies, outcomes, and deadlines for each team member's duties.[3]

In early January 2004, Smith provided training to Gray-Pruitt and the other Leadership team members on Early Head Start performance standards in which she stressed the importance of improving enrollment. In late February 2004, Smith hired Becky Webb ("Webb"), a consultant from another Head Start Program, specifically to provide individual technical assistance and training to Gray-Pruitt in the areas of recruitment, enrollment, family goals, Child Plus, income verification, and training of staff and families. Webb also conducted parent training for the Area Policy Council, which was one of Gray-Pruitt's new duties. Gray-Pruitt also received some training from someone affiliated with the St. Louis YMCA Head Start Program. During these early months of 2004, Smith made herself available to Gray-Pruitt and the other leadership

---

[3]The parties dispute whether Gray-Pruitt was unprepared for these meetings, so the Court will assume she was prepared for the purposes of summary judgment.

team members to discuss strategies related to their new job duties. Gray-Pruitt only asked Smith for help on one occasion.

Smith was not satisfied with Gray-Pruitt's efforts to improve her component areas[4] and placed her on Notice of Corrective Action. The March 3, 2004, Notice contained a written warning and a corrective action plan to address the alleged deficiencies which included:

> 1. Missed deadlines set in the performance work plan to be compliant for continuous full enrollment of 0-5 Head Start programs. 2. Site waiting lists do not reflect the number (5) of viable child files with "accepted" status for child enrollment resulting in continued under enrollment. 3. Verification of family income eligibility was not computed correctly sited by the audit conducted in February. 4. Roma goals and outcomes have not been documented on all families. 5. Parent Interest Questionnaire training has not taken place as of 3/2/04.

The Notice gave Gray-Pruitt until March 10, 2004, to complete the steps outlined in the corrective action plan. When the two women met on March 10 to review Gray-Pruitt's progress in meeting the performance goals outlined in the Corrective Action Notice, Smith determined that Gray-Pruitt's progress was unsatisfactory and decided to place her on probation.

When they met again on March 11, 2004, Smith gave Gray-Pruitt a second Notice of Corrective Action requiring Gray-Pruitt to fix the deficiencies that had been identified in the March 3 Notice of Corrective Action, but had not yet been fixed. The Notice

---

[4]There are several disputes of fact with regard to whether Gray-Pruitt followed through on directives from Smith, and whether these directives conformed with Gray-Pruitt's new job description. Viewing the evidence in the light most favorable to Gray-Pruitt, the Court will assume for the purposes of summary judgment that these directives where either fulfilled or exceeded Gray-Pruitt's job description.

placed Gray-Pruitt on probationary status from March 11 to April 12, at which time she would be dismissed if she did not meet the goals outlined in the second Notice. During this second meeting on March 11, Gray-Pruitt requested leave under the Family and Medical Leave Act ("FMLA") to care for her daughter who had been injured in an automobile accident some months earlier. Gray-Pruitt had previously taken time off for the same reason, though she had not requested FMLA leave before March 11. After hearing this request, Smith left the room to check with Executive Director David Thayer whether Gray-Pruitt had worked long enough to qualify for FMLA leave. She returned shortly and approved the leave.

Gray-Pruitt took FMLA leave from March 12 to April 12, 2004. During her leave, she sent a memorandum to Smith, Thayer, and HDC's Board of Directors regarding the March 3 and March 11 Notices of Corrective Action. On March 19, Executive Director Thayer responded to her memo with a letter telling Gray-Pruitt that:

> A theme running through your responses to the five reasons set forth in the March 3, 2004 Notice of Corrective Action is how things were done in the past . . . . Each team member's job performance is now being evaluated against . . . [the] new performance expectations and outcomes. . . . We all recognize that we have a short time frame in which to improve and prepare the program for the April review. . . . The fact is that we have the time that we have . . . . The probationary period is an opportunity for you to meet the performance expectations stated in the notice.

Near the end of her one-month leave, Gray-Pruitt requested that her leave be extended to April 21, 2004, and HDC agreed. Gray-Pruitt also asked to be demoted to a Family Service Advocate position instead of continuing in her current job. Smith informed her

that HDC procedure would require her to resign first and reapply if she desired a lower position.

Gray-Pruitt returned to work on April 22, 2004. Smith extended her probationary period to allow her time to comply with the March 11 Corrective Action Notice, and continued to monitor progress over the next month. On May 18, 2004, Smith provided Gray-Pruitt with a probation evaluation form showing unsatisfactory ratings in all but two areas. In particular, the evaluation stated that Gray-Pruitt had not maintained full enrollment, was unprepared in leadership team meetings, had failed to train staff adequately, had failed to track enrollment, and continued to struggle with completing work plans. Smith also gave Gray-Pruitt a Notice of Personnel Action indicating that she was recommending Gray-Pruitt's termination to Executive Director Thayer. Smith left HDC a short time later, having brought the Head Start Program into compliance and out of danger of losing funding.

Executive Director Thayer approved Smith's recommendation and forwarded it the Area Policy Council. The Council voted not to terminate Gray-Pruitt's employment, but instead recommended to the Board of Directors that she be maintained for thirty days to give her the opportunity to apply for another position at Head Start. Nevertheless, their recommendation to the board stated, "We feel that it is unfair to Head Start, its clients, or especially Ann [Gray-]Pruitt, to retain her in the position she has held most recently."

The recommendation for dismissal then went before the Board of Directors who conducted a hearing at which Gray-Pruitt and her attorney were present and allowed to

6

Case 2:04-cv-04289-NKL   Document 40-1   Filed 02/06/06   Page 6 of 13

present her side of the story.  Following this meeting, the Board voted to terminate her employment and immediately placed her on leave without pay pending dismissal for:

> Continued non-compliance with Head Start Performance Standards; Inability to meet targeted deadlines; Inability to monitor enrollment/recruitment process properly and effectively, resulting in under-enrollment; Inability to implement information received from trainings and consultants; and Inability to provide leadership and properly train Family Service Advocates.

Since the Board and the Area Policy Council disagreed, the two governing bodies participated in impasse proceedings via teleconference.  Eventually, they agreed to place Gray-Pruitt on thirty days' leave without pay prior to termination in order for her to apply for other positions within the agency as an in-house candidate.  Gray-Pruitt retained her tenure and benefits during this time.  Her employment was finally terminated on June 27, 2004.

## II. Discussion

### FMLA

To state a claim for retaliation under the Family Medical Leave Act, a plaintiff must show: (1) that she engaged in a protective activity, (2) that she suffered an adverse employment action by her employer, and (3) that there is a causal connection between the protected activity and the adverse employment action.  *Darby v. Branch*, 287 F.3d 673, 679 (8th Cir. 2002).  There is no question that Gray-Pruitt requested and received FMLA leave.  Following that protected activity, Gray-Pruitt alleges several adverse employment actions were taken against her, including Smith's negative demeanor when Gray-Pruitt requested FMLA leave, Smith's leaving the room to check if Gray-Pruitt has sufficient

7

Case 2:04-cv-04289-NKL   Document 40-1   Filed 02/06/06   Page 7 of 13

hours to qualify for leave, Smith's extending Gray-Pruitt's one month probation period after she returned from her leave, and her eventual termination. The first two actions clearly do not rise to the level of an adverse employment action. Nor does the extension of her probationary period. Gray-Pruitt was placed on a one-month probationary period beginning March 11 in which to achieve the goals set out in her corrective action plan. That same day, she requested and began a six week period of protected FMLA leave. Since her leave lasted longer than her probationary period had been scheduled, Gray-Pruitt would not have had any opportunity to meet the goals of the corrective action plan upon her return unless the probationary period were extended. Because Smith extended Gray-Pruit's probation to give her the chance to retain her job, something she could not have done without the extension, it cannot be considered an adverse employment action. Only Gray-Pruitt's eventual dismissal is sufficient to satisfy the second element of her claim. As with many retaliatory discharge claims, then, this case boils down to whether there was a causal connection between Gray-Pruitt's FMLA leave and her termination.

The Court does not concern itself with whether Gray-Pruitt's termination was a reasonable personnel decision. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) (observing that federal courts "do not have the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent those judgments involve intentional discrimination."). Rather, the Court is only concerned with whether Gray-Pruitt's termination was causally connected to the exercise of her rights under the FMLA. To

8

resolve that limited issue, the Court must employ the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1002 (8th Cir. 2005). For purposes of that analysis, the Court will assume that Gray-Pruitt has established a *prima facie* case and will turn directly to HDC's alleged non-discriminatory reason for Gray-Pruitt's termination.

Whether justly or not, Smith believed that Gray-Pruitt was not meeting the goals necessary for the Early Head Start Program to achieve compliance with federal standards. She placed Gray-Pruitt on Notice of a Corrective Action twice before Gray-Pruitt requested FMLA leave,[5] the first time on March 3 and the second time on March 11, 2004, the same day she requested FMLA leave, but before the request. In fact, she did not request FMLA leave until after she was placed on probation. She returned to work on April 22, after six weeks of leave, at which time her probationary period was extended to give her more time to meet the goals of the March 11 Corrective Action Notice. As of May 18, 2004, Smith still believed that Gray-Pruitt was not meeting the goals she had set out for her and consequently recommended her termination. Following a review by the Area Policy Council and the Board of Directors, both of whom agreed that Gray-Pruitt's performance warranted dismissal from her current post, she was given thirty days to apply for a different position within the corporation. Her tenure and benefits continued until her

---

[5]As will be discussed below, HDC acknowledges that Gray-Pruitt took time off of work before the Notices of Corrective Action to care for her daughter without exercising her right to FMLA leave. HDC further concedes that had she asked for leave then, she would have received it. However, there is no evidence to suggest that Gray-Pruitt's earlier absences contributed to her termination.

9

termination became final on June 27, 2004. The reasons given for her termination were the same as those given in the corrective action Notices she received before requesting FMLA leave.

Because HDC has presented evidence of a legitimate nondiscriminatory reason for her termination, the burden shifts back to Gray-Pruitt to prove that the purported reason for her termination was pretext. Although she has raised several arguments in an attempt to suggest a discriminatory motive, the Court concludes that Gray-Pruitt has not produced any evidence from which a reasonable juror could infer that HDC's proffered reasons for her termination were pretextual.

First, Gray-Pruitt has argued that all her performance evaluations were good until Smith took over the Head Start Program. This unsupported claim, even if true, doesn't overcome the fact that she received negative evaluations before requesting leave. *See Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (noting that evaluations showing that Plaintiff had performed competently in the past did not render her more recent negative evaluations inherently untrustworthy). Second, Gray-Pruitt argues that she was not even responsible for the Early Head Start Program until Smith took over, and thus any deficits in that program were due to the incompetence of the previous coordinator. HDC does not dispute this point, but argues that everyone on the leadership team was forced to augment their job descriptions with new duties to bring the program into compliance. The issue is not whether Gray-Pruitt was treated unfairly. The question is whether she was treated unfairly because of her FMLA leave request. For

example, Gray-Pruitt has produced no evidence to show that someone else on the management team failed to successfully resolve a corrective action directive, did not request FMLA leave and was permitted to remain in their job. Absent evidence of retaliation because of FMLA leave, unjust personnel decisions cannot be vindicated under the FMLA.

Finally, Gray-Pruitt offers conclusory accusations that Smith was anxious about meeting the performance standards and used Gray-Pruitt as a scapegoat because she requested FMLA leave. She further suggests that when Smith recommended Gray-Pruitt's termination to the Area Policy Council, Smith mentioned Gray-Pruitt's absences. There is no evidence to support these accusations, and they are contradicted by the uncontested fact that Smith extended Gray-Pruitt's deadline to comply with the March 11 Notice of Corrective Action when she returned from her leave. There is simply no evidence from which a reasonable juror could find that HDC terminated Gray-Pruitt's employment because she asked for FMLA leave. HDC is, therefore, entitled to Summary Judgment on Gray-Pruitt's FMLA claim.

### Intentional Infliction of Emotional Distress

In addition to her FMLA claim, Gray-Pruitt sues HDC for intentionally inflicting emotional distress. HDC moves for summary judgment on the grounds that Missouri's Workers Compensation Act preempts Gray-Pruitt's emotional distress claim against her employer and Workers Compensation is her exclusive remedy for any emotional distress from the termination. *See Russell v. United Parcel Service, Inc.,* 666 F.2d 1188, 1192

(8th Cir. 1981); *Waldermeyer v. ITT Consumer Financial Corp.*, 767 F. Supp. 989 (E.D. Mo. 1991). Gray-Pruitt concedes this point in her Suggestions in Opposition, and seeks the Court's leave to amend her complaint to state her claim against Smith instead.

To state such a claim for intentional infliction of emotional distress in Missouri, a plaintiff must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997). There is no evidence or even an allegation in any of the documents before the Court suggesting that Smith engaged in conduct remotely approaching the threshold required under Missouri law. Thus, summary judgment will be granted as to Gray-Pruitt's intentional infliction of emotional distress claim, and her request for leave to amend her complaint is denied.

### III. Conclusion

Accordingly, it is hereby

ORDERED that Defendant HDC's Motion for Summary Judgment [Doc. # 29] is GRANTED.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: February 6, 2006
Jefferson City, Missouri